# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  18-00356-03-CR-W-RK |
| | ) | |
| | ) | |
| HENRY SIMMONS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on two separate motions to suppress filed *pro se* by Defendant Henry Simmons.  On March 29, 2021, Defendant filed a Motion to Suppress claiming there was a lack of probable cause for his arrest on November 27, 2018.  Doc. 123.  The Government filed Suggestions in Opposition on April 27, 2021.  Doc. 128.  Defendant filed his Reply on May 5, 2021, and an additional Reply on June 10, 2021.[1]  Docs. 132, 147.

On May 13, 2021, Defendant filed a second Motion to Suppress challenging the GPS tracking warrant issued for a vehicle suspected in a series of armed robberies.  Doc. 135.  The Government filed Suggestions in Opposition to the second motion on May 27, 2021.  Doc. 139.  Defendant filed his Reply on June 9, 2021.  Doc. 146.

On June 2, 2021, the Court held a combined evidentiary hearing on both motions to suppress.  Docs. 142, 144.  Based upon a careful review of the record and consideration of the

---

[1] Once Defendant filed his original reply (Doc. 132), his first motion to suppress became fully briefed, and no additional briefing was afforded without leave of Court.  However, due to the unique circumstances with Defendant representing himself, the Court has considered the supplemental reply (Doc. 147).

evidence adduced at the suppression hearing, it is recommended that Defendant's two motions to suppress be DENIED.[2]

## I.     PROCEDURAL BACKGROUND

On November 27, 2018, Defendant Simmons and two others were charged by Criminal Complaint with conspiracy to commit Hobbs Act robberies and use of a firearm during and in relation to a crime of violence.  Doc. 1.  That same day, the Court appointed Robert Calbi to represent Defendant pursuant to the Criminal Justice Act.  Doc. 6.  On December 12, 2018, the Grand Jury returned a two-count indictment that charged Defendant and two others with conspiracy to commit Hobbs Act robberies and use of a firearm during and in relation to a crime of violence.  Doc. 17.

On February 28, 2019, Judge Maughmer issued a Scheduling and Trial Order which set trial to commence on October 28, 2019, and also ordered pretrial motions to be filed by May 24, 2019.  Doc. 32.  Mr. Calbi later moved to extend the pretrial motions deadline (Doc. 35), which the Court granted to June 24, 2019.  Doc. 36.  On June 24, 2019, defense counsel sought a second extension of the pretrial motion deadline (Doc. 37) which was granted to July 12, 2019.  Doc. 38. No pretrial motions were filed on Defendant's behalf.

On September 11, 2019, Mr. Calbi filed a motion to continue the trial (Doc. 39) which the Court granted to January 6, 2020.  Doc. 40.  On December 17, 2019, the Court granted a motion to continue filed by a codefendant (Doc. 46) and set this matter for trial to commence on March 16, 2020.  Doc. 47.

---

[2] At the evidentiary hearing held on June 2, 2021, the undersigned advised the parties the Court would issue separate reports and recommendations for the two pending motions to suppress.  Tr. at 124.  Because of the significant overlap in the facts pertinent to both motions, the undersigned addresses both motions in this combined Report and Recommendation.

2

On January 28, 2020, the Grand Jury returned a superseding indictment that charged Defendant and two others with conspiracy to commit Hobbs Act robberies, Hobbs Act robbery, and brandishing a firearm during and in relation to a crime of violence. Doc. 51. Defendant Simmons was also separately charged with attempted Hobbs Act robbery and an additional count of brandishing a firearm. *Id.* On March 12, 2020, Defendant indicated his desire to change his plea, and a change of plea hearing was scheduled for March 23, 2020. Doc. 69. On March 17, 2020, the change of plea hearing was cancelled due to the court closure related to the COVID-19 pandemic.[3]

On June 15, 2020, Mr. Calbi moved to continue the July 6, 2020 trial setting. Doc. 80. The Court granted the request and set trial for November 30, 2020.[4] Doc. 81. On September 16, 2020, Mr. Calbi moved to withdraw due to a "breakdown in communication." Doc. 92. On September 29, 2020, the Grand Jury returned a nineteen-count second superseding indictment against Defendant Simmons which charged one count of conspiracy to commit Hobbs Act robberies in violation of 18 U.S.C. § 1951(a); seven counts of Hobbs Act robbery in violation of 18 U.S.C. § 1951(a); seven counts of brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii); two counts of attempted Hobbs Act robbery in violation of 18 U.S.C. § 1951(a); and two counts of carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i). *Id.*

---

[3] Due to the COVID-19 pandemic, Chief Judge Beth Phillips entered a general order on March 16, 2020 that continued all in-person hearings and trials. *See* U.S. Dist. Ct., W.D. Mo., General Order (Mar. 16, 2020), https://www.mow.uscourts.gov/sites/mow/files/DC-OrderCovid19.pdf. Accordingly, the docket reflects a cancellation of the change of plea hearing. In subsequent general orders, all trials were continued through July 6, 2020. *See* U.S. Dist. Ct., W.D. Mo., General Order (Mar. 24, 2020), https://www.mow.uscourts.gov/sites/mow/files/DC-SupersedingOrderCovid19.pdf and U.S. Dist. Ct., W.D. Mo., General Order (Apr. 20, 2020), https://www.mow.uscourts.gov/sites/mow/files/DC-SupersedingGeneralOrder042020.pdf.

[4] As of the date of Judge Maughmer's order granting the continuance request, the two codefendants charged in the superseding indictment had entered pleas of guilty. Docs. 62, 70.

Following an attorney appointment hearing on October 13, 2020, the undersigned granted Mr. Calbi's motion to withdraw and appointed John Picerno to represent Defendant. Doc. 98. On October 22, 2020, Mr. Picerno filed a motion to continue the trial setting Doc. 100. The undersigned granted the motion and continued the trial to June 7, 2021. Doc. 101. Approximately four months later, on February 23, 2021, Mr. Picerno moved to withdraw as counsel due to "irreconcilable differences" resulting in a "genuine conflict of interest" as to whether to file certain motions. Doc. 107.

On March 11, 2021, Defendant filed a *pro se* motion to suppress due to unlawful arrest. Doc. 113. On March 12, 2021, the undersigned held an attorney appointment hearing during which Defendant requested to proceed *pro se*. Doc. 114. The Court took the matter under advisement so it could hold a formal *Faretta*[5] hearing and afford Defendant additional time to think about his decision. *Id*. Also on March 12, 2021, the undersigned denied Defendant's *pro se* motion to suppress (Doc. 113) as he was still represented by counsel at the time it was filed. Doc. 116. The undersigned held a *Faretta* hearing on March 16, 2021, and entered an order finding Defendant knowingly and voluntarily waived his right to counsel, and granting Defendant's request to proceed *pro se*. Docs. 117-18.

On March 29, 2021, Defendant filed his first *pro se* motion to suppress. Doc. 123. The first motion challenges Defendant's arrest on November 27, 2018. *Id*. at 1. Defendant argues law enforcement did not have probable cause at the time of his arrest, and therefore, all evidence seized during the search incident to arrest should be suppressed. *Id*. at 1-11. Defendant's second *pro se* motion to suppress was filed on May 13, 2021. Doc. 135. In the second motion, Defendant asserts the GPS tracking warrant of a Dodge Durango that was suspected to be involved in a string

---

[5] *Faretta v. California,* 422 U.S. 806 (1975).

of armed robberies was improperly issued by a state judge which violated his right to privacy and his Fourth and Fifth Amendment rights. *Id*. at 1-17.

On June 2, 2021, the undersigned held a combined evidentiary hearing on both suppression motions. Mr. Simmons was present in person, representing himself *pro se*. The Government was present and represented by Assistant United States Attorneys Ashleigh Ragner and Mike Green. At the evidentiary hearing, five witness testified: Special Agent Jason Ramsey, Detective Anthony Castelletto, Detective Loran Freeman, Detective Craig Horalek, and Detective Cole Massey. Additionally, fifteen exhibits were admitted into evidence:

Gov't Exhibit 1 – Application for search warrant

Gov't Exhibit 2 – Jackson County search warrant

Gov't Exhibit 3 – Jackson County search warrant with return

Gov't Exhibit 4 – Picture of license plate reader showing the Durango on August 30, 2018

Gov't Exhibit 5 – Picture of license plate reader showing the Durango on August 24, 2018

Gov't Exhibit 6 – Picture from city camera of the Durango at 85th and Wornall on November 21, 2018

Gov't Exhibit 7 – Picture from city camera of the Durango at 89th and Holmes on November 21, 2018

Gov't Exhibit 8 – Picture from city camera of the rear of Durango at Independence Avenue and Benton Boulevard on November 21, 2018

Gov't Exhibit 9 – Picture from city camera of the side of Durango at Independence Avenue and Benton Boulevard on November 21, 2018

Gov't Exhibit 10 – Picture of rear of the Durango on November 28, 2018

Gov't Exhibit 11 – Picture from home surveillance of Durango from November 21, 2018

5

Gov't Exhibit 13 – Report on Aretago Gates from November 4, 2018

Gov't Exhibit 17 – Complaint affidavit by Detective Freeman

Gov't Exhibit 18 – DOR response for the Dodge Durango

Gov't Exhibit 19 – Google map of I-29 and Northwest Barry Road

## II. FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following:

### Previous Robberies

1. Detective Anthony Castelletto has worked for the Kansas City Police Department ("KCPD") for twenty years, serving thirteen years in patrol, and seven years as a detective. Tr. at 19-20.[6] He is currently assigned to the KCPD's Robbery Unit where he frequently works with other law enforcement officers of the Kansas City Career Criminal Task Force ("KCCCTF"). Tr. at 20.

2. When he arrived to work on November 21, 2018, Detective Castelletto was advised of a string of five robberies, or attempted robberies, which had occurred earlier that morning in Kansas City and Independence. Tr. at 20-21. All five robberies occurred between 12:58 a.m. and 3:59 a.m. Tr. at 21.

3. A review of surveillance videos from the robberies revealed that the suspects' descriptions, including height, weight, clothing, and guns used, were similar, causing Detective Castelletto to believe the robberies were connected. Tr. at 21. Further, all five robberies occurred at 7-Eleven convenience stores. Tr. at 21.

---

[6] "Tr." refers to the Transcript of Hearing on Motions to Suppress. Doc. 144.

6

4. Also on November 21, 2018, law enforcement received an anonymous tip regarding the last robbery reported around 3:59 a.m. Tr. at 22. The individual reported they were in the area at the time of the robbery and observed who they believed to be suspects running from the 7-Eleven and entering a two-toned, early 2000s model Dodge Durango. Tr. at 22-23. The tipster indicated the Durango was dark in color on the top, had gray or silver across the bottom, and fled from the area at a high rate of speed. Tr. at 22-23.

5. Based on the tip, Detective Castelletto asked KCPD's Law Enforcement Resource Center to review traffic cameras, or license plate reader cameras, in the area near the time of the robbery. Tr. at 23.

6. Upon review of the cameras, a detective located a Dodge Durango that matched the description from the anonymous tip and had traveled through the intersection of Independence Avenue and Benton Boulevard on Wednesday, November 21, 2018, at approximately 3:54 a.m. Tr. at 23, 25-27; Exs. 8-9. This intersection is near the location where the fifth robbery occurred, specifically, the 7-Eleven store located at 3201 Independence Avenue. Tr. at 25-26; Exs. 8-9. The fifth robbery was reported to the KCPD approximately five minutes later at 3:59 a.m. Tr. at 26.

7. Because the camera captured a vehicle matching the tipster's description near the fifth robbery location, KCPD checked other city cameras for the intersection of 85th and Wornall, which was near the second robbery location at 8901 Wornall Road. Tr. at 26-27.

8. Upon reviewing the cameras near the Wornall location, Detective Castelletto observed the same two-toned Durango traveling through the intersection of 85th and Wornall

Road at approximately 1:41 a.m.  Tr. at 27-28; Ex. 6.  Additionally, cameras captured the same two-toned Durango going through the intersection of 89th Street and Holmes Road at approximately 1:52 a.m.  Tr. at 27-29; Ex. 7.  The second robbery occurred at 8901 Wornall Road at approximately 1:53 a.m.  Tr. at 27.

9. Detective Castelletto described the Durango in both sets of photos as being two-tone, with silver on the bottom, and a sticker in the back window.  Tr. at 30.

10. Because Detective Castelletto believed the same vehicle was near at least two of the robberies reported in Kansas City, he contacted Detective Loran Freeman with the Independence Police Department ("IPD") to inquire about the Independence robberies on the same date.  Tr. at 30-31.

11. IPD's description of the suspects from the Independence robberies was similar to the description of the suspects involved in the Kansas City robberies.  Tr. at 31.  IPD also identified the suspect vehicle as a two-toned Dodge Durango with a dark color on top, and a light color on bottom, which made Detective Castelletto believe the same vehicle was involved in the Kansas City and Independence robberies.  Tr. at 31-32.  IPD also indicated the vehicle had a temporary license plate on it.[7]  Tr. at 32.

12. Detective Castelletto ran the vehicle's description through KCPD's computer system to determine if any vehicle matching the suspect vehicle's description had been reported in any incident in Kansas City.  Tr. at 32-33.

13. During his research, the detective found a casualty report from November 4, 2018, in which a Dodge Durango matching the suspect vehicle dropped off an individual with a gunshot wound at the hospital.  Tr. at 33; Ex. 13.

---

[7] In November 2018, license plate reader cameras ("LPR") in Kansas City were not capable of reading temporary license plates.  Tr. at 32.

8

14. This report included information associated with the Dodge Durango such as the name Aretago Gates, an address of 2739 Chelsea Avenue, a temporary tag number of 03U14D, and a Vehicle Identification Number ("VIN"). Tr. at 33-35.

15. When Detective Castelletto ran the VIN through the Department of Revenue ("DOR"), he determined there was a license plate assigned to the vehicle. Tr. at 35-36; Ex. 18. The DOR report identified the registered owner as Sabrina Hill who shared the same address as Aretago Gates: 2739 Chelsea Avenue. Tr. at 36-37; Ex. 18.

16. Detective Castelletto was familiar with the Gates family because several individuals who lived at that house have been involved in, or have been named in, several investigations during his seven years in KCPD's Robbery Unit. Tr. at 33.

17. Additionally, the detective knew Aretago Gates has at least two brothers, Quadarrious and Keandre Gates, and their mother's name is Sabrina Hill. Tr. at 33-34, 36.

18. According to the DOR report, the license plate associated with the VIN was different than the temporary tag the officers observed in the November 4, 2018 casualty report. Tr. at 36-38; Ex. 18.

19. Detective Castelletto ran the license plate associated with the VIN through the LPR which returned two "hits," or responses. Tr. at 38.

20. The first response was from August 24, 2018 and showed a Missouri license plate (FP4 U3J). Tr. at 38-39; Ex. 5. It was captured in the northbound lanes of Meyer and Prospect in Kansas City, Missouri. Tr. at 39; Ex. 5. The second response showed the same vehicle in the northbound lane of Manchester Trafficway in Kansas City, Missouri on August 30, 2018. Tr. at 40; Ex. 4.

21. The LPR responses showed a vehicle of the same make and model that was also two-toned and had a sticker in the middle of the back windshield.  Tr. at 40.  Upon review of the August 30, 2018 images, Detective Castelletto determined the sticker on the back windshield was a Wonder Woman sticker.  Tr. at 40.

22. Once confident he had the proper suspect vehicle involved in the November 21, 2018 robberies, Detective Castelletto contacted the KCCCTF and turned the investigation over to Detective Freeman.  Tr. at 41-42.

23. Detective Freeman is a detective with the IPD, assigned to the KCCCTF, and has worked with the IPD since May 2001.  Tr. at 44.  Through his assignment with the KCCCTF, he is also deputized with the Federal Bureau of Investigations ("FBI"), which allows him to assist the FBI in federal investigations if necessary.  Tr. at 45.

24. Based on Detective Freeman's investigation, he believed there were common features of all five November 21 robberies.  Tr. at 48.  One common suspect was identified in all five robberies.  Tr. at 48.  The common suspect wore white tennis shoes with orange on the soles.  Tr. at 54.  Further, a gun was used with a laser sight in at least two of the November 21 robberies.  Ex. 17 at 2, 5-6.

25. As a part of the investigation of the first robbery, which occurred at the 7-Eleven store located at 11101 East 23rd Street in Independence, Missouri, investigators obtained home surveillance video from a private residence near the 7-Eleven.  Tr. at 48-49; Ex. 11.  The video showed a two-toned Dodge Durango that appeared to have a rear temporary license plate on the back of the car but no front license plate.  Tr. at 48-49; Ex. 11.

10

26. Detective Freeman was advised by Detective Castelletto of the search he had performed of KCPD's system, which identified the 2003 two-toned Dodge Durango. Tr. at 50. Detective Freeman was also provided the vehicle's VIN and temporary tag number (03U14D), and information that the vehicle was registered to Sabrina Hill with an address of 2739 Chelsea Avenue. Tr. at 50-51.

27. Additionally, KCPD reports showed the vehicle as being driven by Aretago Gates in early November 2018. Tr. at 50. Detective Freeman knew Aretago Gates was a suspect in prior robbery investigations in Kansas City. Tr. at 50.

28. On November 25, 2018, at approximately 2:55 a.m., members of the KCPD were dispatched to a Domino's Pizza located at 2516 Northeast 43rd Street, Kansas City, Missouri in response to a report of a robbery. Tr. at 52. Domino's employees told KCPD officers that two male subjects wearing dark clothing with their faces partially concealed by other garments approached the door to the building and tried to gain entry. Tr. at 52. Because the employees had already locked the doors when the store closed, the suspects were unable to enter. Tr. at 52. The suspects used their weapons to open fire into the glass of the door, shattering it, and allowing them to enter the building. Tr. at 52-53.

29. As officers were responding to the Domino's robbery, they were advised there was another robbery being reported at the 7-Eleven located at 4251 North Antioch Road in Kansas City, Missouri, which was directly across the street from Domino's. Tr. at 53. Investigators reviewed the surveillance video of the robbery at the 7-Eleven store and saw two suspects approach the building but only one suspect enter and contact the store clerk. Tr. at 53-54.

11

30. Detective Freeman believed the suspect who entered the 7-Eleven was the same suspect from the November 21, 2018 robberies. Tr. at 53-54. The suspect approached the 7-Eleven employee with a silver firearm with an extended magazine and was wearing white tennis shoes with orange on the soles that appeared similar to the shoes worn by the common suspect from the November 21 robberies. Tr. at 54.

31. Based on the information available to investigators at the time, Detective Freeman believed the two simultaneous robberies on November 25 were connected to the November 21 robberies. Tr. at 54.

32. Later on November 25, 2018, KCPD was dispatched to a Sinclair store located at 10921 Hickman Mills Drive in Kansas City, Missouri in response to a reported robbery. Tr. at 54-55. Officers reviewed Sinclair's surveillance videos and determined the suspect who entered the 7-Eleven earlier on November 25 was also involved in the Sinclair robbery. Tr. at 55. Specifically, officers observed the suspect in the Sinclair video with the same clothing and the same white tennis shoes with orange on the soles that were seen in the 7-Eleven robbery. Tr. at 55.

33. During the Sinclair robbery, the suspect carried a different firearm than the one used during the 7-Eleven robbery. Tr. at 55. Specifically, he carried a smaller frame black handgun with a laser sight connected in front of the trigger guard. Tr. at 55.

34. The handgun with the laser sight was significant to investigators as it was unique in appearance and had appeared in more than one surveillance video from the prior robberies. Tr. at 55-56, 69; Ex. 17 at 2, 5-6.

35. Based on the information he obtained from all robberies, Detective Freeman on November 26, 2018 applied for a search warrant for a GPS tracking device of the Dodge Durango.  Tr. at 56.

### Application for GPS Tracking Warrant

36. At the time of his warrant application, Detective Freeman had not yet identified any suspects.  Tr. at 56.  He applied for the GPS tracking warrant in order to covertly track and follow the vehicle to determine definitively if it was, or was not, being used in the furtherance of any other violent crime.  Tr. at 56.  Additionally, he hoped the GPS tracking warrant would assist him in identifying possible suspects for the robberies. Tr. at 56-57.

37. Detective Freeman submitted the warrant application for review by Assistant Jackson County Prosecutor Hallie Williams.  Tr. at 57; Ex. 1.  The warrant application was then presented to Jackson County Circuit Judge Twila Rigby.  Tr. at 57, 59-64; Ex. 1.

38. According to Detective Freeman, the warrant was presented to a state judge, rather than a federal judge, because the matter was being investigated as a state level criminal investigation unless a federal nexus developed as a part of the investigative work.  Tr. at 57.  At the time of the warrant application, Detective Freeman did not have an open investigation with the U.S. Attorney's Office.  Tr. at 13-14, 57.

39. At the time of the warrant application, the FBI was not in charge of, or directing, the investigation.  Tr. at 58.  Special Agent Jason Ramsey initiated a case in the FBI report writing system to allow FBI agents to participate, but he was not involved in the application or process to obtain the search warrant for the GPS tracking device, nor was

he involved in the execution of the warrant or deployment of the GPS device. Tr. at 10-11, 17, 58.

40. The application and warrant indicated the vehicle was last known to display the Missouri temporary tag 03U14D and believed to display VIN 1D4HS58N13F520027. Tr. at 62-63, 75-76. Detective Freeman used the phrase "last known to display" because he had information, determined by Detective Castelletto and other investigators, that indicated the license plate or temporary tag was being switched out with other temporary tags or vehicle registration information. Tr. at 63.

41. At 3:37 p.m. on November 26, 2018, Judge Rigby signed both the warrant application and the search warrant for GPS tracking. Tr. at 59-60; Ex. 1-2.

42. Prior to surveillance, a briefing was held for investigators and officers. Tr. at 63-64, 86-88. During the briefing, a discussion was held including the unique and pertinent facts regarding the robbery series, information or intelligence as to potential suspect vehicles, potential suspect descriptions or identities, and an investigative plan. Tr. at 64, 86-88. Officers and investigators also discussed what their objective was for surveillance. Tr. at 64.

43. Regarding the suspect vehicle, the officers and investigators planned to covertly maintain surveillance of the vehicle to a point where they could deploy two GPS devices on the vehicle. Tr. at 64, 92. The first tracking device was the primary device while the second device was redundant in the event there was a mechanical or an electronic failure with the first device. Tr. at 64.

14

44. Just after 4:00 p.m. on November 26, 2018, investigators observed the Dodge Durango near 27th Street and Chelsea Avenue. Tr. at 65. This residence was associated with Sabrina Hill, the registered owner of the Dodge Durango. Tr. at 65.

45. Around 5:15 p.m., approximately an hour after investigators first observed the Dodge Durango, and prior to the GPS devices being deployed, investigators noted the Durango displayed a Missouri temporary tag of 03GM6Y, which was a different tag than what was listed on the warrant. Tr. at 65. However, according to Detective Freeman, agents had previously determined that the vehicle being surveilled was the vehicle for which the warrant was issued. Tr. at 65-66.

46. The GPS tracking devices were placed on the suspect vehicle around 6:15 p.m. by Detective Michael Miller. Tr. at 60, 66, 91; Ex. 3. Detective Miller works for KCPD and is assigned to the KCCCTF but is not a federal agent. Tr. at 66.

47. After executing the tracking warrant, Detective Freeman realized there was a typographical error in his warrant application. Tr. at 61; Ex. 1. Specifically, on page five of his application, there is reference to a white Pontiac Grand Prix. Tr. at 61; Ex. 1. Detective Freeman intended for this reference to be removed from the template he used when preparing the search warrant but failed to do so. Tr. at 61; Ex. 1. The remaining portions of the search warrant accurately describe the vehicle intended to be tracked. Tr. at 61-63; Ex. 1.

48. During the surveillance operation, agents following the vehicle and individuals monitoring the GPS electronic data were able share their information and communicate through a radio frequency. Tr. at 66-67, 91-92. FBI Special Agent Ramsey, however, was not involved in receiving any data transmitted from the GPS device. Tr. at 58-59.

15

49. While investigators were following the Durango, they observed what appeared to be different colored laser lights emanating from inside the vehicle. Tr. at 68. These lights appeared to be laser optics, or sights, moving about the vehicle's interior and seemed consistent with those used as aiming devices on firearms. Tr. at 68-69.

50. The officers also observed the Durango make slow, repetitive passes by fifteen to twenty convenience stores. Ex. 17 at 8. The Durango eventually drove to a shopping center near I-29 and Northwest Barry Road in Kansas City, Missouri after 2:00 a.m. on November 27, 2018. Tr. at 68, 93.

### Incidents of November 27, 2018

51. On November 27, 2018, officers observed the Dodge Durango make multiple passes through the shopping center containing a number of businesses, including a Phillips 66 and a Taco Bell. Tr. at 69, 93, 96; Ex. 19.[8] After passing slowly by those businesses, the vehicle continued to a nearby Walmart parking lot where it stopped briefly. Tr. at 96. At this time, most of the businesses in the shopping area were closed for the day. Tr. at 96. However, the Phillips 66 was still open, and the Taco Bell's lights were on with employees present. Tr. at 96-97.

52. Detective Craig Horalek, a KCPD detective assigned to the KCCCTF, was working surveillance of the Durango. Tr. at 84-85. After the Durango slowly passed through the shopping center, Detective Horalek parked his vehicle in a position where he could see the whole area. Tr. at 97. He did not observe any pedestrian traffic in the area at the time of the surveillance. Tr. at 98.

---

[8] The Government's Exhibit 19 is a Google map capture of the area of I-29 and Northwest Barry Road. Ex. 19. However, on the date of the robberies, the layout of the shopping area contained different structures. Tr. at 94-95; Ex. 19.

16

53. The Dodge Durango left the Walmart parking lot, drove behind the Taco Bell and the restaurants near it, and then traveled to the west side of Phillips 66. Tr. at 98. The vehicle left Phillips 66 and traveled to the south side of Barry Road, where it stopped in a residential neighborhood at an apartment complex. Tr. at 69, 98-99.

54. Investigators chose to set up different points of observation in the general area to wait and see if anything developed after the vehicle had stopped in the residential area. Tr. at 69.

55. According to Detective Freeman, another surveillance detective (Task Force Officer Dion Dundovich) observed four individuals exit the Dodge Durango. Tr. at 70, 80, 82. Detective Freeman drew his attention to the south side of Barry Road in the general area immediately north of where he believed the vehicle was parked. Tr. at 70, 80-82. Soon thereafter, Detective Freeman observed four males walking together on a sidewalk on the south side of Northwest Barry Road who then proceeded to split up into two groups of two. Tr. at 69-70, 80.

56. Detective Freeman relayed his observations over the radio to the other investigators participating in surveillance. Tr. at 70. He knew there was at least one business in the area that was still open. Tr. at 70. Detective Freeman was also aware that the past robberies had also occurred between the hours of 12:00 a.m. and 4:00 a.m., and at least two of the previous robberies had also occurred simultaneously. Tr. at 70-71. Based on his training and experience, and having worked similar investigations in the past, he believed a robbery was about to be committed. Tr. at 70.

57. Detective Horalek observed two males, later identified as Defendant and a minor, walk northbound between two restaurants (Winstead's and Kato's), turn eastbound, walk to

17

the northwest corner of Winstead's where they stopped and looked in the direction of the Phillips 66 for approximately fifteen to twenty seconds. Tr. at 99.

58. The two males then turned around and began walking westbound behind the buildings in the direction of the Taco Bell. Tr. at 99. The taller of the two individuals, who was later identified as Defendant Simmons, began to fumble in the front of his pants near the waistband as if he was trying to remove something. Tr. at 100. Based on his training, experience, and what he knew about the case, Detective Horalek believed the individual was retrieving a handgun. Tr. at 100.

59. Detective Horalek observed the two males walk up to the east side of the Taco Bell, and then head toward the back of the building where the employee entrance would be. Tr. at 101. He observed the two male subjects looking around and being aware of their surroundings. Tr. at 101.

60. He next observed the two males come around the north side of the building, walk down the westside, and then turn south in the drive-thru area. Tr. at 101. The two individuals appeared to be staying close to, or "hugging," the building. Tr. at 101. Detective Horalek believed the two individuals were trying to avoid being seen by anyone. Tr. at 101.

61. When the two males were on the westside of the building, Detective Horalek lost sight of them due to his position in the parking lot. Tr. at 102. He then heard radio traffic from Detective Freeman advising that the other two individuals had approached and entered the Phillips 66. Tr. at 102.

62. Detective Horalek then observed the two males come around to the front of Taco Bell, where Defendant grabbed the door to try to open it. Tr. at 102. Defendant was not able

to enter the Taco Bell.  Tr. at 102-03.  At no point did Defendant or the minor attempt to kick in the door or break the window to enter the building.  Tr. at 108.

63. At this time, a garbage truck showed up and started removing trash from the dumpster area, and the two males appeared to be nervous.  Tr. at 102.  Detective Horalek observed them walk back and forth, and then both individuals attempted to open the door again.  Tr. at 102-03.

64. Detective Horalek heard Detective Freeman say over the radio that the two other suspects had left Phillips 66.  Tr. at 103.  He quickly looked to his left and observed two individuals running southbound toward Barry Road away from the Phillips 66.  Tr. at 103.  Detective Horalek turned his attention back to the Taco Bell and observed Defendant and the minor go back around to the north side of the building.  Tr. at 103.  At this time, he lost sight of the two males because the garbage truck blocked his view.  Tr. at 103.

65. An arrest operation was then authorized by supervisors involved in surveillance.  Tr. at 103.  Radio traffic informed Detective Horalek that officers had taken the two other individuals into custody, so he responded over to the Taco Bell to take control of that scene.  Tr. at 103-04.

66. Detective Cole Massey who works as a detective for KCPD was also on surveillance on November 27, 2018.  Tr. at 111-12.  He arrived in the area of I-29 and Northwest Barry Road and parked behind a business across the street from the Taco Bell.  Tr. at 115-16.

67. Detective Massey was listening to the radio traffic describing what the other detectives and investigators were observing.  Tr. at 116-17.  Specifically, he heard that officers

believed two individuals had just robbed the Phillips 66, and he was aware of the simultaneous robberies just days earlier. Tr. at 116. He also heard that two other individuals appeared to be entering the Taco Bell. Tr. at 116. Because of information regarding the prior simultaneous robberies, Detective Massey moved into the area of the Taco Bell to apprehend the two other individuals. Tr. at 116.

68. Upon their arrival at the Taco Bell, Detective Massey observed two individuals on the eastside of the building attempting to gain entrance. Tr. at 117. He believed the individuals saw the police vehicle so they moved to the north side, out of his view. Tr. at 117. Based on his observations, he believed the individuals were trying to flee or possibly discard evidence. Tr. at 118.

69. By the time Detective Massey entered the Taco Bell parking lot, Defendant and the minor were observed running down the embankment between the Wendy's and the Taco Bell. Tr. at 117-18. Officers exited their vehicles and took the two males into custody without further incident. Tr. at 118.

70. Defendant matched the description of a common suspect in the previous robberies. Tr. at 75. Additionally, Defendant was arrested while wearing white tennis shoes with orange on the soles. Tr. at 75, 105.

71. When Defendant was arrested, he also was wearing a zipper gray-hooded sweatshirt but did not have a shirt on underneath. Tr. at 105, 118-19. This stood out to Detectives Horalek and Massey because it had just snowed and was extremely cold out. Tr. at 105, 119.

72. Officers recovered two firearms near the Taco Bell where Defendant and the minor were taken into custody that were consistent with the description of the firearms used

in the previous robberies the officers were investigating. Tr. at 74-75, 105-06, 120-21. Specifically, the firearms recovered were a black handgun with a laser sight attached, and a black and silver handgun with an extended magazine. Tr. at 74-75. Additionally, officers recovered a white t-shirt. Tr. at 121.

73. While the arrests were occurring, tactical officers secured the Dodge Durango that was parked in a parking lot of an apartment complex approximately 150 to 200 yards south of Barry Road. Tr. at 71.

74. Keandre Gates, brother of Aretago and Quadarrious Gates, was the sole occupant in the Durango. Tr. at 72. Officers also found a Glock semi-automatic firearm inside the car. Tr. at 72.

75. The Durango was the same vehicle on which GPS tracking devices were deployed pursuant to the warrant. Tr. at 73. Additionally, it bore the same Wonder Woman decal on its rear windshield and had a temporary license plate of 03GM6Y. Tr. at 73-74; Ex. 10. Officers seized the vehicle and were able to determine the VIN matched the VIN listed on the search warrant documents. Tr. at 74.

## III.    DISCUSSION

Defendant's first motion seeks to suppress all evidence and testimony related to such evidence obtained from the search of his person incident to his arrest on November 27, 2018. Doc. 123 at 1. Defendant argues the search and seizure violated his Fourth and Fifth Amendment rights because the officer lacked reasonable suspicion or probable cause that Defendant was involved in criminal activity. *See id*. at 1, 7-9. The Government first asserts the Court should deny Defendant's first motion as untimely. Doc. 128 at 3-4. Alternatively, the Government claims the officers had probable cause to arrest Defendant. *Id*. at 13-19. The Government submits the

21

investigators determining probable cause relied upon their knowledge of previous robberies, the suspect vehicle, and the suspect's physical description. *Id*.

Defendant's second motion to suppress seeks to suppress any and all electronic surveillance from the GPS tracking device placed on the Dodge Durango in November 2018. Doc. 135 at 1. Defendant argues the GPS tracking device violated his Fourth and Fifth Amendment rights, and his right to privacy. *Id*. at 12-17. Additionally, Defendant alleges it was improper for a state court judge, rather than a federal court judge, to issue the warrant because there was "federal involvement" in the investigation. *Id*.

The Government again asserts Defendant's second motion to suppress should be denied as untimely. Doc. 139 at 1. Alternatively, the Government alleges Defendant lacks standing to challenge the GPS tracking devices on the Durango as he was a mere passenger of the vehicle and had no possessory interest or expectation of privacy. *Id*. at 12-14. The Government further states the investigation was not a federal investigation, but rather a state investigation that led to federal charges, so the issuance of the warrant by a state court judge was appropriate. *Id*. at 14-17.

## A. Timeliness of Both Motions

Motions to suppress evidence "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(C). This Court has the authority to set a deadline for pretrial motions. Fed. R. Crim. P. 12(c)(1). The Court may consider, at its discretion, untimely pretrial motions "if the party shows good cause" for the delay. Fed. R. Crim. P. 12(c)(3); *see also United States v. Reichel*, 911 F.3d 910, 916 (8th Cir. 2018); *United States v. Trancheff*, 633 F.3d 696, 697 (8th Cir. 2011). To show "good cause," the movant bears the burden of showing "both cause and prejudice." *United States v. Fogg*, 922 F.3d 389, 391 (8th Cir. 2019).

It is undisputed that both motions to suppress are untimely. However, as Defendant outlines in his reply to his first motion to suppress, he has been represented by two separate defense attorneys during the pendency of this action who did not file pretrial motions, including motions to suppress. Doc. 132 at 2-3. The Court would note that Defendant has expressed a desire for a motion to suppress to be filed on his behalf on at least three separate occasions: (1) Defendant's first request for new counsel was based in part on his desire for a motion to suppress to be filed; (2) Defendant attempted to file his own *pro se* motion to suppress[9]; and (3) Defendant's second lawyer's request to withdraw was based in part on Defendant wanting a motion to suppress to be filed. Docs. 74, 107, 113.

The undersigned is familiar with the procedural history of this matter and Defendant's desire to have a motion to suppress filed. Although it is certainly debatable whether Defendant made the proper showing of cause and prejudice for the untimely filing of both motions to suppress, in the interests of justice the undersigned recommends the Court reach the merits of the two motions to suppress.

### B. Motion to Suppress – GPS Tracking Device

The Fourth Amendment specifically provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. "Fourth Amendment rights are personal rights which...may not be vicariously asserted." *Rakas v. Illinois,* 439 U.S. 128, 133-34 (1978) (citations omitted); *Alderman v. United States,* 394 U.S. 165, 174 (1969) (citation omitted). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth

---

[9] This motion to suppress was denied as Defendant was still represented by counsel at the time of filing. *See* Doc. 116.

Amendment rights infringed." *Rakas*, 439 U.S. at 134 (citing *Alderman*, 394 U.S. at 174). To seek relief for an unconstitutional search, a person must have a cognizable Fourth Amendment interest in the place searched, a concept often referred to as "standing." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).

When evaluating Fourth Amendment standing, the Court must determine if an aggrieved individual "had a legitimate expectation of privacy in the area searched or the item seized." *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020) (citation omitted). Defendant bears the burden of establishing by a preponderance of the evidence that he or she has standing. *Id*. To meet this burden, Defendant must prove (1) "he himself asserted a subjective expectation of privacy in the place searched or object seized," and (2) "his subjective expectation of privacy is objectively reasonable." *United States v. Douglas*, 744 F.3d 1065, 1069 (8th Cir. 2014) (citation and internal quotations omitted). "A defendant who fails to prove a sufficiently close connection to the relevant places or objects searched has no standing to claim that they were searched…illegally." *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (citation and quotations omitted). When determining if a defendant has standing, the Eighth Circuit has considered factors including:

> ownership, possession and/or control of the area searched, or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991)).

Regarding the search of a vehicle, a passenger who asserts "neither a property nor a possessory interest" in the vehicle lacks a reasonable expectation of privacy and thus lacks Fourth Amendment standing. *Rakas*, 439 U.S. at 148. Numerous Eighth Circuit cases have observed a

mere passenger generally does not have standing to challenge a vehicle search where he does not have a property or possessory interest in the car. *See*, *e.g.*, *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017); *Anguiano*, 795 F.3d at 878; *United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010); *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004); *United States v. Green*, 275 F.3d 694, 698-99 (8th Cir. 2001). Limited use or control of the vehicle, such as sharing driving duties, alone does not establish Fourth Amendment standing. *Anguiano,* 795 F.3d at 878. Additionally, merely being present in a vehicle with the owner's permission is not determinative of standing. *See Rakas,* 439 U.S. at 148.

In this matter, there is no evidence that Defendant either owned or had any type of property or ownership interest in the Dodge Durango. The evidence before the Court clearly established the vehicle was registered to Sabrina Hill, who is the mother of the Gates brothers. There was evidence that Aretago Gates was the driver of the vehicle in a prior incident involving him dropping off a passenger who had been shot at a hospital, however there is no evidence that Defendant ever drove the vehicle. Further, Defendant offered no evidence that he had any type of possessory interest in the vehicle. At most, Defendant was an occasional passenger in the Dodge Durango.

This evidence alone is insufficient to establish Defendant had a reasonable expectation of privacy in the vehicle. *See Marquez*, 605 F.3d at 609 (finding the defendant lacked standing to contest the placement and use of a GPS device because he did not own or drive the vehicle and "was only an occasional passenger"). Accordingly, Defendant lacks Fourth Amendment standing to contest or challenge the installation and use of the GPS device placed on the Dodge Durango by law enforcement officers. *Id.* The undersigned recommends the Court deny Defendant's second motion to suppress (Doc. 135) due to lack of Fourth Amendment standing.

## C. Motion to Suppress – Lack of Probable Cause

As stated *supra*, the Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. Const. amend. IV. A warrantless arrest does not violate the Fourth Amendment if it is supported by probable cause. *Royster v. Nichols*, 698 F.3d 681, 687-88 (8th Cir. 2012). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation and internal quotation omitted). Because the probable cause standard is a fluid concept turning on the assessment of probabilities in particular factual contexts, it cannot be reduced to a "neat set of legal rules." *See id.* at 370-71. Notably, probable cause is not a "high bar." *District of Columbia v. Wesby,* 138 S. Ct. 577, 586 (2018); *United States v. Edwards,* 891 F.3d 708, 711 (8th Cir. 2018).

To determine the existence of probable cause, a reviewing court looks at the totality of the circumstances as set forth in the information available to the officers at the time of the arrest. *United States v. Kelly,* 329 F.3d 624, 628 (8th Cir. 2003). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Chappell*, 779 F.3d 872, 878 (8th Cir. 2015) (quoting *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007)). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013) (citation omitted). Instead, the mere "probability or substantial chance of criminal

26

activity, rather than an actual showing of criminal activity" is all that is required. *Id.* (citation omitted). Additionally, an officer is not required to personally witness the events providing probable cause but, instead, can rely on "the collective knowledge of all law enforcement officers involved in an investigation…if there is some degree of communication." *United States v. Edwards*, 891 F.3d 708, 711-12 (8th Cir. 2018) (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)).

Here, the Government has provided sufficient evidence to establish the officers' probable cause to arrest Defendant on November 27, 2018. Detectives Castelletto and Freeman both testified to the information they knew regarding a string of five armed robberies which occurred on November 21, 2018. Specifically, their investigation revealed that five separate 7-Eleven convenience stores were robbed between the hours of 12:58 a.m. and 3:59 a.m. and that the description of the suspects including their height, weight, clothing, and the weapons used were similar. In surveillance footage obtained during the investigation, a common suspect was seen at all five of the robberies wearing white tennis shoes with orange on the soles. Additionally, investigators determined that the common suspect conducted one of the two simultaneous robberies on November 25, 2018, and a subsequent robbery of a Sinclair store later on November 25.

Investigators determined the vehicle used for all five of the November 21 robberies was a two-toned Dodge Durango with a Wonder Woman sticker on the back windshield. After applying for and receiving a warrant for GPS tracking, investigators were able to track the Dodge Durango beginning on November 26, 2018. Notably, Officers observed laser lights coming from the Durango. This was significant as officers were aware that one of the weapons used in several prior robberies had laser sights. The officers also observed the Durango make slow and repetitive passes

27

around fifteen to twenty convenience stores on the evening of November 26. In the early morning hours of November 27, 2018, the Durango was observed driving slowly behind a Phillips 66 and a Taco Bell in a shopping center area, parking for a period of time at a nearby Walmart, and then leaving after a short time.

As investigators continued their surveillance, they observed the Dodge Durango drive south across Barry Road and park in a residential neighborhood. Officers then observed four men near the vicinity of the parked vehicle walking toward Barry Road. Detective Freeman observed the four individuals split into two groups of two and separate as they crossed Barry Road. Officers confirmed there was no other pedestrian traffic or activity that late at night. Detective Freeman saw two of the men walk toward the Phillips 66 Convenience Store, and the other two men walk toward the Winstead's located just to the west. This observation was significant, as two of the November 25 robberies occurred simultaneously at businesses in close proximity to each other.

Detective Horalek testified that the two men who walked toward the Winstead's appeared to pause and look back toward the Phillips 66. After a short pause, the two individuals walked toward the Taco Bell. Detective Horalek observed these two individuals appear to stay close to, or "hug," the wall of the building as if they were attempting to stay out of sight. He observed one of the suspects retrieve an item in his waistband, which the detective believed could be a firearm. The two individuals were observed to be looking around and staying very aware of their surroundings. He testified the two males each pulled on the doors of the Taco Bell and found them to be locked. Being unsuccessful, the detective observed the two suspects walk around the building, maintaining a close proximity to the wall of the restaurant, and try the south door of the building. When those doors did not open, the two suspects appeared to become nervous and looked around.

28

Around the same time, the detectives received information over the radio that the Phillips 66 had been apparently robbed, and an arrest was authorized for the two groups of men. When the detectives pulled into the Taco Bell parking lot, the two individuals went around the back of the building and were later seen running down the embankment between the Taco Bell and the Wendy's. Detective Massey believed the two individuals were aware of the police presence and went around the building to possibly flee or discard evidence. One suspect, later identified as Defendant, was arrested wearing a jacket without a shirt on, and white tennis shoes with orange on the soles. As the detectives conducted investigation at the scene, they discovered a white t-shirt, and two guns – one with an extended magazine and one with a laser sight – which were similar to the firearms used during the previous robberies.

In light of the totality of the circumstances, including the detectives' knowledge of the circumstances surrounding the previous robberies, the observations made while tracking the Dodge Durango on November 26-27, the information they received via radio regarding the movements of the four individuals, and Defendant's subsequent movements and behavior at the Taco Bell, the undersigned recommends a finding that there were sufficient facts to lead a reasonable person to believe Defendant was about to commit a crime and his arrest was supported by probable cause. It is recommended that Defendant's Motion to Suppress challenging probable cause for his arrest (Doc. 123) be denied.

## IV.     CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's two *pro se* Motions to Suppress. Docs. 123, 135.

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: July 8, 2021

_/s/ W. Brian Gaddy_
W. BRIAN GADDY
UNITED STATES MAGISTRATE JUDGE